the appellant in this matter. There are several issues involved in this case, and we've both sides have briefed them, I think, pretty well, but I would like to address the main issues as I see them, and those are that Mr. Chandler and I both have had extensive experience in representing trustees over the years, and we both know what the duties of a trustee in bankruptcy are, and that is to take care of the bankrupt's estate, to recover preferences, fraudulent transfers, restore the estate to a Excuse me, counsel. I have a couple of specific questions. Sure. If I understood the facts right, and I'm not sure that I do, Aalfs bought receivables from the bankrupt for $186,000. That's $200,000 face value of receivables. Correct. So the bankrupt got $186,000 for the receivables, and then Aalfs collected $163,000 on the receivables. Correct. And the bankruptcy court said Aalfs has to give it back. Right. So at this point, Aalfs is now out $186,000 plus $163,000 for the receivables. Basically, it's paid for them twice. That's right. Have I got that right? Absolutely. Absolutely. So the idea is disgorge the money from the receivables, but they already paid for the receivables. The bankrupt got the money. That's exactly right. So what status is your proof of claim? I mean, Judge, I mean, if you look at the estate, I mean, Judge, Klein's theory on this was that you still have a proof of claim against the estate. You just have to weigh it in line with everybody else. What were the insecure creditors paid, or do we know what they're going to be paid? They'll get very little. I don't think they've been paid anything so far. Right. So there's no distribution yet. No. But the assets, I take it, at least on paper thus far, are not sufficient to pay the claims. That's correct. Do we have any idea? I know this is a little off the record, but it helps me put it in context. Any idea what percentage that the insecure creditors will have? Well, it's hard to say. I haven't looked at that in some time, but I would say more in the range of 25 to 30 percent. All right. That would be my estimate. Mr. Chandler might have a better estimate on that. So if it plays out under that theory, then you get 25 percent of 185,000, or actually more than that, that you had to pay back. Okay. All right. So the issue, though, as I see it, is that there shouldn't be any windfall to the estate because Mr. Alves paid dollar for dollar. In fact, he paid more than dollar for dollar for these factoring of these accounts receivable. He paid cash, got the account, the account was assigned to him, and he took the risk of loss in making those purchases. And that was one of the things that the bankruptcy court didn't see. Tell me something else now. Yes. I'm wondering why it's not voidable. And if it is voidable, whether there's some equitable provision that says even though it's voidable, nevertheless, as a matter of equity, it shouldn't be voided because there's a windfall to the estate. Okay. In all the cases I've cited, and I've got some others that have come down since then, it says unless there's a diminution of the estate or a depletion of the estate, there can be no recovery by the trustee. Does that go to whether it's voidable or whether there's a recovery as a separate matter? Well, it's not avoidable unless it's an avoidable transaction. In other words, under Section 549 and Section 550, upon which the trustee relied, it's only avoidable if there's been a diminution or depletion of the estate. But the section doesn't say that. You've cited some cases which you say bring that into our consideration. Well, the cases, of course, that's their interpretation, but even the trustee's own case of Henry Rochez has held that you cannot recover under 549 and 550 unless there's been a diminution of the estate. Well, now, if Hoss was a clean-hearted and equitable man who had bought these accounts, paid the 186, I think it was, to the estate, and then he recovers whatever he can get on them, and he's got the accounts that are left, the maximum amount that the estate would have been damaged would have been about $14,000. That's correct. And you would think, well, then you'd give a judgment in favor of the estate for $14,000, and that would treat these accounts as if they were all 100 percent collectible.  And everybody would be even. That's correct. And if he were a clean, equitable guy, I don't – I can see the logic of that. But both the BAP and the Bankruptcy Court commented on the fact that he couldn't make a loan to the estate of more than $100,000. So if you categorize this as a loan, he's violated that order. And I think at one time he asked permission to buy accounts of the estate. Did he not? No, that's not correct. He did not. He went to the court and asked permission to loan the debtor money, which was granted up to $100,000, as you stated. He didn't ask the court for permission to buy accounts receivable because it was believed that that was in the ordinary course of business. That never came up. There was never any prohibition against him buying the accounts. No. And every witness – there isn't one single bit of evidence that every witness testified, including the trustee's own witness, that factoring of accounts was in the ordinary course of business. Every single one. Well, for distressed companies. That's what the evidence said. For newer start-up companies. Yes. But it's not in the ordinary course of running a business that is running, I guess, normally. You don't sell your accounts receivable. I thought it was sort of a creative theory. But frankly, even in a bankruptcy, you're doing 11, selling all of your accounts. It's pretty dramatic. And I don't think it can be considered in the ordinary course of business. But he didn't sell all the accounts. He sold a few of them. That would be in excess of a million dollars. Wait. That really matters. It was not all the accounts. It was just a fraction of the accounts? That's correct. How big a fraction? About 20 percent. So it wasn't a bulk sale of all the accounts? No. No. The debtor was operating. And the debtor would come to Mr. Alves and say, look, I've got a payroll to make. I've got taxes to pay. Would you buy some accounts receivable? And he said yes. And he bought them. Unfortunately, the bankruptcy court thought that these were loans. And they were not loans. And I think I've cited the court thought they were loans because you had this other fellow that had agreed to pay Alves whatever his losses were. Well, but that guarantee that was referred to had nothing to do with the factoring of accounts. It only related to, if you read the custom milling agreement, the guarantee only related to the cutting of logs. It had nothing to do with. Now, it's true that Mr. Alves testified that he applied the guarantee against all of his losses on his tax return. Well, he's a CPA. I think that would be the appropriate thing to do. But the guarantee had nothing to do. It specifically states it's for the custom milling of logs. And that's where the losses might occur. And your contention is that Mr. Alves was, there was nothing inequitable about what he was doing. No. He was conducting himself as a. No, the debtor had, in fact, been factoring accounts prior to the Chapter 11 with other parties. So it was. And Evelyn Giddings for Six Rivers Bank, who testified for Pelley, as a bank officer, I mean, a loan officer, said factoring was customary in new or start-up businesses. And Straight Line was, in effect, a new business in certain aspects because North Coast Hardwoods had gone out of business. Straight Line took over the operation. So from the standpoint of certain operations, it was a new or start-up business. And, yes. I'm confused about something about factoring. Okay. When I studied in law school, which is getting to be a while ago now, it wasn't just new or start-ups or troubled businesses. It was whole industries, like as Gilmore on secured transactions says, that's how it works in the textile industry. Right. It's just the routine way that things are done in the textile industry. I have a vague recollection that a furniture retailer that I knew told me that that's just how furniture works. Right. The garment industry, same way. Yes. Yes. Yes. That's very true. Is it still that way or is that all just an anachronism? No. It seemed like just kind of retailer's banking. Yes. And Mr. Beckman, who was the bank officer for Crocker Bank for years, testified that it's customary. They factored accounts. Evelyn Giddings for Six Rivers Banks said, we factor accounts all the time. I mean, it's a very customary thing. And for anyone not to expect that to occur is just not as do not have their eyes open. Well, I don't think you expect it to occur in a Chapter 11 when you've gone for a loan. That's what disturbed the bankruptcy court, that there'd been a relationship with the parties, that you expect disclosure of these matters. And that's why it seems to me the bankruptcy judge got upset, is that he thought something else was going on here, especially with a side deal on the guarantee. I think you're right, Your Honor. Rightly or wrongly, that seemed to what concerned the court. This was not a normal deal. I think that the court was very much mistaken about what factoring was. And I wanted to just reach you. It's in my brief, but it hits home. It really does. There was a colloquy between myself, Mr. Chandler, and the trial judge. And it said, Mr. Chandler stated that, well, normally a factoring agreement has an agreement to repurchase the accounts if not paid within 90 days. The judge says, yeah, I know all of that. The judge did not understand what factoring was, and so made a decision, because he didn't understand factoring, that this was a loan. And that's the basis upon which the bankruptcy trial judge made its decision, that it was a loan and not an outright purchase. And it was strictly an outright purchase. I thought the judge was mad because he thought it looked like this was being done behind the court's back after the bankruptcy had already gotten going and everything should be with court approval. I don't know what was in the judge's mind, but I do know what he said on the record, and that's why I base my position on that. May I return to the diminution argument? We've never held one way or another under 549 whether diminution of the estate is required, right, in the Ninth? Correct. I've looked at the cases that you cite. Most of them have to do with 547, and the ones that stand for the proposition under 549 don't have any analysis of that. They just sort of cite the 547 cases. Why do you think? It's hard, because under 549, you don't get the ordinary course of business discussions as you do under 547, so you've got to kind of extrapolate those discussions under 547. But there are cases that I have cited that definitely say that there must be a depletion of the estate before the monies can be recovered. But here the estate, you know, they were paid dollar for dollar. In fact, they were paid more than dollar for dollar. Well, that's not what I was heading toward, actually. It was why should we adopt the rule for either 547 or 549 that diminution of the estate is required when the text of both those statutes doesn't require it? Well, I think that's how the case law has developed. Well, the case law has developed in our circuit, and it's all, as far as I can tell, mostly at the bankruptcy court level. The BAP held otherwise, so why should we adopt a rule for 549 that would require diminution of the estate? I think equity demands it. I think that this estate would be unjustly enriched if you were to uphold this judgment and force Mr. Allen to pay twice for the factoring of these accounts. You know, I'm not talking about this case. I'm talking about the general rule of requiring diminution, because the theory of it, especially in Chapter 11 when you have an ongoing enterprise, you're trying to get postpetition. You're trying to get a transfer of postpetition assets or postpetition transfers, is that, you know, you may or may not need it. If you aren't going to get paid 100 percent, maybe they should be paid 100 more, you know, an increased percentage. I mean, if there's some benefit to the estate from voiding the transfer. Well, the benefit to the estate is to keep the business operating, and that's what was happening with the factoring of accounts. The code says under Chapter 11 that the debtor is entitled to do certain things in the ordinary course of business, and factoring was testified to by the various witnesses that this was in the ordinary course of business. Let me put my question a different way. Let's assume that we adopt the position of the dissent in the BAP and basically limit the recovery. Why would we consider diminution of the estate as a prerequisite for recalling the transfer? You're arguing basically, look, let's take a look at this whole deal. Let's return what was just. But under your theory, we wouldn't even get there because there's no diminution in the first instance. Right. Right. Right. Yeah, but I don't understand that. I mean, why aren't you taking care of with the 550 analysis as the dissent points out? Well, let's say that the debtor had sold a pile of lumber to Mr. Allis for $180,000. Now, that's dollar for dollar. He got lumber in exchange for money. Ordinary course of business. Now, are you going to say that Mr. Allis can be penalized because he bought some lumber? He bought accounts. The difference is that he paid dollar for dollar, cash for cash. And the estate was not harmed. In fact, it enabled it to continue to operate, to pay its employees, to pay its taxes. That assumes that the value of the accounts was not 100 percent, which, you know, probably it wasn't. I don't know. But the value of the accounts were the value was what Mr. Allis paid for them. Right. Or maybe the value of the accounts was what he collected, although apparently he still had some left that he hadn't collected. So maybe the value was what he paid for them, but maybe it wasn't. To the creditor, if you're looking at the vertical test for a moment here, he would look at, well, this business could collect 100 percent of those accounts. Now, maybe that's illogical to say a creditor would think that you could collect 100 percent of your accounts receivable. Probably is illogical. Well, he bought them at a 5 percent discount, something like that. Yeah, it's a pretty minor discount. Yeah. And he didn't collect them anyway. I mean, he only got $163,000. That was the amount of the judgment. And that's what he actually collected, so. I would imagine a lot of people pay a lumber yard as long as they think they're going to need to buy lumber from them on credit in the future. But if it looks like it's going down the tubes, then they stiff them. Yeah. Yeah, that's true. Do you want to? I'll save three minutes for rebuttal. And, Mr. Chandler, as you get into your argument here, it occurs to me that if Mr. Alce was trying to play fast and loose with the bankruptcy court and engaged in inequitable conduct, it would probably not be appropriate to give him an equitable, you know, remedy of crediting him with the money that he'd already paid. But if he were an innocent person, why would that be wrong? Anyway, when you get to that, I just. Well, first of all, if I could start from the beginning. The Straight Line Investments was not in business before the bankruptcy. North Coast Hardwoods, his sister corporation, was. It was closed down. Straight Line Investments took over all of its assets. The lumber didn't move. The accounts receivable didn't move. And Six Rivers National Bank had a security interest as to North Coast Hardwoods. It was all moved over to Straight Line in the blink of an eye on paper. Lumber didn't move. Same stacks. Everything was the same. Ledger cards for the accounts didn't change. And the security agreements provide for security interest on all accounts receivable. Correct. The whole, everything, every asset owned, I assume, was subject to a security agreement. Correct. The debtor came before the court, requested the bankruptcy court approve a loan from Mr. Owls up to $500,000 on a rolling basis. And that loan was to be secured by the inventory, the equipment, and the receivables. Six Rivers National Bank knew that the receivables were their collateral. They knew that the lumber sitting there in the pile was their collateral. And Straight Line Investments acted as if it were some new and different lumber and objected to the proposed borrowing. I'm missing something. I don't actually understand how the loan relates to the factory. The Owls loan? Yes. Well, Your Honor, it... They're two different things, it seems. In the excerpts, the appellee's excerpts number four is the custom milling contract. And it's labeled custom milling contract, but the first sentence says, Charles D. Owls agrees to loan money to Straight Line Investments for the purchase of logs in advance for cost signs, etc. That is a loan agreement. That agreement is not for milling Mr. Owls' lumber as... But I don't understand what that has to do with factoring the accounts receivable. It looks like it's just a separate deal. Well, the court found, the bankruptcy court found at trial that the accounts were not, were actually pledged as collateral. It was a loan. And the court found that from various facts. One, the bookkeeper, Mr. Owls' bookkeeper, testified that these were advances. She used the word advances. Then she used the word loans to describe these transactions. Mr. Owls also had a guarantee. Mr. Arnot argues the guarantee had nothing to do with the factoring agreement, but that's not what Mr. Owls testified to at trial. I don't see why the guarantee matters here. It's not a guarantee by the bankrupt estate. It's a guarantee by the man whose company has failed. Correct. Personally. Correct. It's a third-party guarantee. But if it was an outright purchase, there wouldn't be a guarantee. I don't know why not. Well, a factoring agreement... What the factor is doing is buying accounts receivable. When a lot of people pay their debts, well, people pay the electric company, not just because they bought the electricity, but because they want to buy electricity next month. They don't want their lights to go out, so they keep the electric company happy. A lot of people walk out on a debt when they don't think they have to keep the creditor happy anymore. I don't actually see the connection here between the guarantee and the loan and the pointed issue, which is the factored accounts receivable. Well, the court... Why it makes it... Under Section 364, the debtor asked for permission to borrow the money, and the court pledged the accounts receivable. And the court said no. No receivable. To borrow the money. So instead, the creditor bought the accounts outright. Then he turned around and bought the accounts. Now, the argument is, is that that is under 363 in order to... The judge said, the straight, or Alf says, these people are useful to me in business. I would like to loan them money to get them over this tight period. The judge says, no beyond certain limits. The Alf then says, I really need these people in business. Instead of loaning them money, I'll buy something from them. So they'll have some cash to get past the tough times. And so Alf then buys, for $186,000, some receivables. On its face, there's nothing about the price to suggest unfairness or looting the bankrupt estate, because you really wouldn't expect to collect 100 cents on the dollar of pretty much any accounts, let alone these. And indeed, it turns out, he can't collect 100 cents on the dollar. He can't even collect the discount price he paid. He gets 163,000. So he is now out. The difference between the 163 he collected and the 186 he paid. And then after the court gets done with him, he's out twice. He's also out the 163 that he collected on the receivables he bought. That strikes me as the essence of the case, a serious equitable issue. And I'm having trouble connecting the other stuff to it. Well, it is the essence of the case, Your Honor, and it gets right down to the difference between an ordinary course defense under 547C and the applicability of Section 550. Under 547C, ordinary course is a defense to a preference. That's where we talk about diminution of the estate, is when we talk about a preference, because there is a transaction there that, in effect, straddles the bankruptcy filing. And you have a pre-petition transaction that depleted what would be there the day the bankruptcy petition is filed. In a 549 case, that is a depletion of the estate or a transfer of estate assets after the commencement of the case. And Section 550 does not talk in terms of set-off. It talks in terms of equity, just as Your Honor pointed out. But the bankruptcy court found that Mr. Owls was conspiring with Mr. Gault to take over the straight-line business, and he was not acting equitably. And the... What was the inequity exactly? I know the bankruptcy court thought it was, but what was the inequity? The pile of lumber moved over to Mr. Owls' warehouse as soon as the trustee was appointed. All the lumber moved to Mr. Owls, two blocks away. And Mr. Owls was, in the record, he testified that his customers, for his business, West Coast Hardwoods, were actually the customers of Straight Line Investments, who had been the customers of North Coast Hardwoods. So the lumber was physically moved to Owls' warehouse? Yes, it was. Absent a finding of inequitable conduct, would you agree that the proper measure of damages in this case would be the return of the accounts receivable or the equivalent amount? Well, I think, Your Honor, the cases are pretty clear that, if absent... Well, it's not inequitable conduct. It's really a good-faith transferee. A good-faith transferee gets a credit for his or her improvement to the transferred property. And I think there's a case I cited, the Rice case. I think that's a BAP case that talks about a sale. I think that was a sale of a note. There's another one. I think the Court, this Court, just decided in May of... It wasn't just a site effort. This case went up the first time, called Lissardi. And in that case, it talks about a good-faith purchaser getting credit for what he paid for the property, even though it's a post-petition transfer. So is the thrust of your argument that a 550 set-off is never appropriate when there's been a finding of a return of property under 549? I think that's right, Your Honor. I also think that the Bankruptcy Court found that Mr. Alves not only knew the bankruptcy, but this account purchase thing started right after, right after the Court ordered that they couldn't encumber those receivables, they couldn't take those receivables. And the reason was that there was a great amount of dispute over what lumber was sold that created those receivables. In other words, was that the Six Rivers pile of lumber that was sold that created the receivable? And actually, it got, the inventory got so balled up, they never could figure out which was which. And that's why there was a huge dispute over the receivables. But I think the burden on Alves is to show that, is to show that there was not only a, that he not only paid value, which I think he probably did for the receivables from all the evidence, but he also treated it as a loan when he took the money on the guarantee, he took a deed of trust on the guarantee. What do you mean took the deed of trust on guarantee? Well, Mr. Galt gave Mr. Alves a guarantee. You're talking about the personal guarantee by the owner of the failed business. Correct. But it was treated as a loan. What's the security interest there? I thought it was a guarantee. He initially did the, Mr. Galt gave a pledge of stock to Mr. Alves, and then he later had a change of heart and substituted a deed of trust. So he secured his personal guarantee. Yes. Something. But it was his property. What if, hypothetically, Alves had said to the bankrupt business, it's in my interest that you continue in business. The judge won't let me lend you the cash you need. I know you need cash, and my personal, if misguided, belief is that if you just get a little cash injection now, your business will be okay. Since the judge will not let me lend you the cash and take a security interest, here's what I'm going to do. I'm going to buy lumber, way more than I need now, enough lumber to take care of me for all of next year, and that way you'll get a big cash injection. So he buys $200,000 worth of lumber for cash. Can the trustee void the transaction and get the lumber back? No. Straight Line Investments was in the business of selling lumber, milling lumber, and selling lumber. They were not in the business of generating accounts and selling them, nor was Alves. They tried to make the leap to an ordinary course of business. This is a sale in the ordinary course of business under 363, but notice they never get to the elements for proving that it is an ordinary course transaction under this Court's decision in the Danton-Russell case, which I've cited in the brief. In that case, there's two pronged tests to determine whether it's in the ordinary course. There's a vertical or horizontal and a vertical, and I always get which one is which confused, but one of them is what the creditors would expect, and in this case, the creditors would expect that the debtor would come back before the Court because the Court had already denied the use of receivables for gaining cash flow by financing, so the creditors would and did expect them to come back before the Court. The other test is whether or not it's in the ordinary course of business between the parties. This debtor had no ordinary course of business. I heard Mr. Arnot just say that this debtor sold accounts pre-petition. That's not true because it didn't exist pre-petition. It was formed when they moved the title to the pile of lumber. Probably referring to the other business. Could be, but not this business, and Mr. Alves is an accountant. Yes, he buys, he may buy accounts receivable on occasion, but in this particular case, the bankruptcy court found that the whole scheme to buy accounts was a way to obviate this Court's order under 364. Yeah, well, that's, and of course, that's the nub of the case. What just, whatever happened to the bank's security interest in these accounts? Because it held a security interest in all the accounts, and the accounts were sold to House, and House collected the money. Did any of that money get to the bank? The post-petition receivables, the answer is no. The post-petition receivables, if they're truly generated post-petition with post-petition assets, labor, et cetera, et cetera, are not subject to the bank's security interest. It would only be the lumber in the stack, and the bank could never prove which lumber was in the stack and which lumber got sold on these accounts. So the bank did not get any of these proceeds. It just didn't establish its security interest in the proceeds. No, it never was able to be done. Okay. All right. Well, probably beside the point anyway. It seems to boil down to whether this finding, let's assume it's a finding by the bankruptcy court of inequitable conduct by Alves, is clearly erroneous, or if it's not a finding, if it's a conclusion of law. Well, I think. Is it appropriate or erroneous? And so far, it kind of seems like he was precluded from lending the money, and so he did lend the money. He bought the accounts. Well, it was a way to obviate it. It was a way to obviate the restrictions on the lending. Well. And that's what the Court found. Yeah, the Court. I know they did, but it just seems there's kind of a jump there. But even the sale of the accounts isn't in the ordinary course of business. Right. Under the Dan Russell case. Yeah. So if you wanted to sell these receivables outright, like, for example, you have a lumber business and you want to sell the delivery truck outright, it requires a court order, or it is avoidable transfer, an avoidable transfer. Right. I'm assuming it's avoidable transfer. The question is, what's the remedy? Well, it comes right down to 550. And 550 says that you can recover the value of that transfer. All right. Go ahead. I'm sorry. Debtor got the value. It got 186,000. Now all it needs is 14, and then it gets 100 percent of its accounts received. The problem, Your Honor, with that in a bankruptcy is cash management as the debtor in possession. The debtor in possession is a fiduciary. And when the debtor in possession starts playing fast and loose with cash management, the creditors can't see where the money is coming from nor where the money is going. And that is a huge problem. And had they come to the court and asked the court for the specific authority to have safeguards to keep the money and to keep the debtor accountable for the money. Because when the music stopped, the money was gone. Right. The music stopped. He got 163 for what he paid 186 for. That's true. He had a guarantee. Well. And he violated the court's order. Right, right. But I think the question is, I understand that argument. But I think the problem I have with the case, the one I've been mulling over, is the seeming inequity of a double payment to the estate. You know, 550, if you're talking about the value returned, would seem to limit you to what the actual value of the accounts receivable are. Now, Rice seems to be a bit different to me because it's not an equivalent situation. The estate, there's no evidence that the estate had any value one way or the other in Rice. Why should we say that you get essentially a double recovery from the voidable transfer? Well, I don't think you're getting a double recovery. I think, as Judge Klein pointed out in his concurring opinion, that the creditor, Owls, has an unsecured claim for what he paid, the 186. Right. No, I understand what Judge Klein said. The real question is, is why should Owls be paid more than the bank? That's the real question. The bank couldn't assert its security interest is one thing, I guess. Well, the bank advanced a lot of money. The bank advanced a lot more money than Mr. Owls did, but yet, theirs was prepetition and Mr. Owls' was postpetition. The bank did it legally. Mr. Owls did it contrary to a court order, but yet Mr. Owls gets more than the bank? But why should we care about the bank? They're not a party. And the trustee does not represent the interest of the bank. No, the trustee represents the interest of the estate. The estate, it's different. And the reason you're saying he did what the bankruptcy court said he couldn't do is because you treat this as a loan instead of the bank. Two reasons, Your Honor. Under 364, he couldn't do it because the court said no. No loan. No loan. In excess of $100,000. Under 363, he could only do it if it was within the ordinary course of business unless the court orders otherwise. The court believed it ordered otherwise in making its order, number 2 in our excerpts. The court believed it ordered otherwise. And then the court should have been asked for permission because it was not, it doesn't meet the vertical test and it doesn't meet the horizontal test of the Dant and Russell case to be within the ordinary course. It seems, though, you've just in effect made an argument for your adversary by saying the court believed it had ordered otherwise. The court evidently did believe it had ordered otherwise, only it had not ordered otherwise. The court said don't do A, so Alfs and the bankruptcy estate say, okay, we cannot do A, so we will do B, which the court did not speak to. And the court said I believe I ordered otherwise, that you couldn't do B, only it didn't. But if the court ordering otherwise under 363 is only important if a sale of accounts receivable is in the ordinary course of business under the test of Dant and Russell, which it's not. Let me ask you something about ordinary course. Let's take, oh, some of these companies we were chatting about earlier, furniture, retailers, textile companies, garment industry companies, that their business is selling ladies' clothes or sofas or something like that. The way they finance themselves routinely is by factoring their receivables. Is ordinary course limited to selling the clothes or the sofas? Does it not include their routine financing method of factoring receivables to get some cash flow? I think ordinary course has to do with transfer of their assets, and I think that factoring has to do with post-petition financing. And every case I have ever seen, ever been involved with, requires a post-petition order. Hold on. I don't think I made my question clear to you. Furniture company, furniture retailer. I guess I knew one of these, so it's easy for me to construct a hypo. They sell furniture, nothing down, and you can pay over the course of a year or even two or three years in fairly small installments. Their prices are kind of high because this is how people buy furniture from them. What happens after they have a happy customer leave the store is they now have one less sofa on the floor, and they have no money. And they don't have money to buy another sofa, and they don't have money to pay their light bill or their help. So what they do is they routinely, every month, they factor their receivables to That's how they get their cash flow. So they get a whole lot less than what the customers actually pay, but they keep the cash flowing every month. And I'm trying to figure out, is ordinary course of business limited to the customers who come in Saturday and buy a sofa, or does it also include their routine method of financing, which is to sell the paper the customers give them? Well, Your Honor, I think you have the same problem in the automobile industry with flooring agreements, which is a financing agreement as well. And you have the same, generally in the furniture business, my experience is it's recourse paper. So they sell the paper to somebody else, and then on default it comes back to the furniture store. And I think all of those methods, each one of them require an order under 364. Once the bankruptcy has been filed. Once the bankruptcy has been filed. Doesn't the fact of the bankruptcy make this all different because it stops the past secured arrangements? Yes. You start a new secured arrangement, and for that you need court permission. Correct. I mean, that's the essence of 363 financing, right? 364. I'm sorry, 364 is correct. Yes, Your Honor, that's correct. My time's up. Thank you. Thank you, counsel. Counsel. Your point on the ordinary course of business, Your Honor, is exactly what we have, you know, need to focus on. And why I cited Evelyn Gidding's testimony was that she was a bank officer that testified against Mr. Owls, but did testify that factoring Six Rivers Bank had done fine. They did factoring. They did it all the time. Wells Fargo did factoring. And that factoring was in the ordinary course of business for newer startup businesses. And what happened was that Six Rivers Bank had a meeting with Mr. Gold. But isn't the essence of this a bit different? I mean, it may be accepting your point that it might be used, but when you're doing startup financing in a Chapter 11, you need court permission, right? No. Not if it's in the ordinary course of business. Well, see, isn't that exactly what disturbed the bankruptcy judge? That in this case, it said, look, what you're doing really is financing. And for that, you need my approval. And I find that, you know, that this was not in the ordinary course of business because the transaction, given the history of what happened in this court, was really a loan. It's a financing arrangement. And therefore, whether it's startup companies or not, you need court permission to do that. Isn't that what made the bankruptcy judgment happen in this case? Well, I think what happened was that there was some mix-up between North Coast Hardwoods and Straight Line Investment as to, you know, the accounts receivable. Six Rivers Bank never had a security interest in the accounts receivables. But there was some question about where they came from. And so when Mr. Owls went to the court and asked for permission to loan the debtor up to $500,000, and the court limited him to $100,000, as Your Honor said, it didn't even discuss factoring the sale of accounts, the sale of lumber or whatever else you're going to sell. And so factoring was another way for the debtor to continue on in his business, pay his taxes, pay his employees. And it was very critical. Otherwise, Mr. Owls would have... Well, if it's so critical, why didn't they ask the court for permission? I don't understand that. Because it was not believed that it was necessary because it was believed it was in the ordinary course of business. I'm missing something there that may just be practical and not legal. My experience is when you deal with people who are under some kind of court order, whether they're bankrupts or infants or probate estates or whatever, you say, Mother, may I, no matter what, because you don't want the court to feel blindsided and slap you back. I understand that concern. Why wouldn't they do that here, even if it wasn't legally, technically necessary? I can't answer that question because I believe that they just thought the principles got together initially and believed it was in the ordinary course of business. And so they started factoring. Mr. Owls had been in the factoring business for many, many years. And he was up in Alaska. And he testified, I believe, that he had factored loans with the federal government and the state government up there of in excess of $400 million. So, I mean, he was experienced in factoring. And I think he believed that this was in the ordinary course of business. So I think the Ninth Circuit could easily adopt a policy, at least if the estate is necessary, under 549 and 550. Thank you, counsel. Thank you very much. It's been my experience that the bankruptcy bar are really a bunch of educated guys. I mean, you're good lawyers. And you argue well. And you know your subject. And it's a pleasure to hear from you. We've been doing this, Mr. Ketterle, for many, many years. It is. It's always a treat to deal with the bankruptcy bar. Okay. Thank you. We enjoyed the three of you. The panel was excellent. Thank you. Thank you. Thank you. Thank you.
judges: Thompson, Kleinfeld, Thomas